# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

JEANNIE PARSONS, successor Personal
Representative of the Estate of Randy Parsons,
Deceased,

Case Number: 07-13335

                          Plaintiff,

STEPHEN J. MURPHY, III
UNITED STATES DISTRICT COURT

v.

VIRGINIA M. MORGAN

PATRICIA L. CARUSO, et al.,

UNITED STATES MAGISTRATE JUDGE

                          Defendants.

_____ /

## REPORT AND RECOMMENDATION:
## (1) GRANTING DR. MCCARTHY'S MOTION FOR SUMMARY JUDGMENT BASED ON GOVERNMENTAL IMMUNITY (Doc. No. 102); (2) GRANTING DEFENDANTS CARUSO AND BIRKETT'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 113); AND (3) GRANTING DEFENDANTS PAUSITS, ALEXANDER, BOND, AND KOCOT'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 120)

Before the court are three motions for summary judgment: 1) Defendant Dr. McCarthy's Motion for Summary Judgment Based on Governmental Immunity (Doc. No. 102); 2) Defendants Caruso and Birkett's Motion for Summary Judgment (Doc. No. 113); and 3) Defendants Pausits, Alexander, Bond and Kocot's motion for summary judgment (Doc. No. 120). For the reasons discussed below, the court recommends that all three motions be **GRANTED**.

## I. Background

In 1990, Randy Parsons, the decedent, was convicted of second-degree murder and sentenced to 15 to 30 years' imprisonment. Two years later, in 1992, while in the custody of the Michigan Department of Corrections, Parsons was first declared mentally ill. (Doc. No. 130, Pl.'s Resp. to

1

Caruso et al.'s MSJ, Ex. A, Order Following Prisoner Transfer Determination).  In 1995, Parsons was diagnosed with a seizure disorder and was prescribed Dilantin, on which he was to remain indefinitely.  (Doc. No. 105, Pl.'s Resp. to McCarthy's MSJ, Ex. A, Psychiatric Examination).

Over the course of Parsons' imprisonment, he was transferred to different prisons in the Michigan penal system twenty-five times.  (Doc. No. 105, Pl.'s Resp. to McCarthy's MSJ, Ex. F, Transfer Summary).  On August 25, 2004, Parsons was transferred from Gus Harrison Correctional Facility to Standish Maximum Correctional Facility ("Standish").  (Compl. ¶ 31).  Parsons arrived at Standish on August 25th.  (Doc. No. 120, Pausits et al.'s MSJ, Ex. 1, Transfer Assessment Screening).  At 6:40 p.m, Nurse Jessica Pausits conducted a medical intake.  (*Id.*)  Nurse Pausits noted that Parsons arrived without his medication and scheduled him to see a medical service provider the next day.  (*Id.*)

The next morning, August 26, 2004, at 8:49 a.m., Physician's Assistant S. Hope Heebsh examined Parsons.  (Doc. No. 105, Parson's Resp. to McCarthy's MSJ, Ex. D, SOAP Note Summary).  PA Heebsh noted that Parsons had a seizure disorder and was extremely agitated.  (*Id.*)  PA Heebsh prescribed Dilantin, with instructions that the medication be given on August 26, 2004;  PA Heebsh did not order the prescription to be obtained from the local pharmacy.  (*Id.*)

A few hours later, Parsons was seen by a psychiatrist, Dr. John F. McCarthy.  (Doc. No. 105, Parson's Resp. to McCarthy's MSJ, Ex. E, McCarthy Dep. 19).  During that visit, Dr. McCarthy observed that PA Heebsh had already examined Parsons.  He confirmed the psychotropic medications that Parsons had been taking and ordered the same.  (McCarthy Dep. 19, 50).  In his prescription order, Dr. McCarthy prescribed Lithium Carbonate, Zyprexa, and Remeron.  (Doc. No. 105, Parson's Resp. to McCarthy's MSJ, Ex. F, Orders Summary).  Dr. McCarthy ordered a 30-day

supply, which he knew would come from a pharmacy in Oklahoma called Pharmcorr.  (McCarthy

Dep. 17).  Because Parsons was somewhat agitated, Dr. McCarthy also ordered a five-day supply

of medications to be obtained from the local pharmacy.  (McCarthy Dep. 17).

        The medication nurse was responsible for obtaining medications prescribed to the prisoners.

(Doc. No. 120, Pausits et al.'s MSJ, Ex. 6, Larry Alexander Dep. 17-18).  Unless the medical service

provider included special instructions, the medications were ordered from Pharmcorr the afternoon

that they were prescribed.  (Alexander Dep. 23-25).  Pharmcorr would then send the medications

via Fed Ex, and the medications would usually arrive by noon the next day.  (McCarthy Dep. 68).


        The prison received Parson's Dilantin prescription on August 27, 2004.  (Alexander Dep.

110; Doc. No. 120, Pausits et al.'s MSJ, Ex. 7, MDOC Bureau of Health Care Record).  According

to MDOC health records, Parsons received his first dose of Dilantin at 6:00 p.m. on August 27,

2004. (Doc. No. 120, Pausits et al.'s MSJ, Ex. 8, Medication Administration Record).  Also, at some

point on August 27, 2004, Parsons sent a "kite" requesting mental health services.  (Doc. 120,

Pausits et al.'s MSJ Ex. 15, MDOC Progress Note Dated 8/27/04).  Nurse Lawrence Alexander

processed the kite and forwarded it to outpatient mental health.  (*Id.*)

        The next morning, Parsons received a second dose of Dilantin on August 28, 2004 at 8:00

a.m. (Doc. No. 120, Pausits et al.'s MSJ, Ex. 8, Medication Administration Record).  The parties

did not provide medical records or other evidence indicating whether Parsons received doses of his

psychotropic medications that were ordered by Dr. McCarthy from the local pharmacy.

        After the evening meal on August 28th, while Parsons was on his way back to his cell, a

prison guard noticed that he was wearing his shower shoes on top of his state shoes.  (Doc. 120,

Pausits et al.'s MSJ, Ex. 9, Ford Dep. 18).  The guard instructed Parsons to go back to his cell, where

he was "laid in" at approximately 4:37 p.m.[1]  (Ford Dep. 17; Doc. No. 133, Defendants' Reply Br.

Ex. 2, DVD of Parsons).  Housing Unit Three staff notified Sergeant Steven Bond that Parsons was

acting strangely.  (Doc. 120, Pausits et al.'s MSJ, Ex. 10, Bond Aff. ¶ 4).  At approximately 4:59

p.m., Sergeant Bond went to Parsons cell, where he found him laying unresponsive on the floor.

(*Id.*; DVD)  Sergeant Bond then notified  health care, and he and other prison guards began chest

compressions.  (Doc. 120, Pausits et al.'s MSJ, Ex. 12, Critical Incident Report).  An ambulance was

called and arrived at 5:21 p.m. (*Id.*)  Parsons was transported to Standish Community Hospital,

where he was pronounced dead at 5:56 p.m.  (*Id.*)

Two autopsies were performed.  The Arenac County Medical Examiner performed the first

autopsy, and concluded that Parsons died of "seizures disorder." (Doc. No. 113, Caruso et al.'s MSJ

Ex. 3, Arenac County Autopsy Report).  Parsons' family had a second autopsy performed at

Spectrum Health by a forensic pathologist, Stephen D. Cohle, M.D.  (Doc. No. 113, Caruso et al.'s

MSJ Ex. 4, Spectrum Health Autopsy Report).  Dr. Cohle concluded that Parsons' cause and manner

of death were undetermined.  (*Id.*)  Dr. Cohle had a toxicology screen done on a sample of Parsons'

blood.  (*Id.*)  The laboratory found less than 20 ng/mL[2] of Buproprion, an anti-depressant sold as

Wellbutrin or Zyban, 50 ng/mL of Mirtazepine, an anti-depressant sold as Remeron, and 80 ng/ML

of Metoprolol, a beta-blocker used to treat hypertension, which is sold as Lopressor or Toprol-XL.

(*Id.*)  According to the evidence presented by the parties, Parsons was never prescribed Buproprion

---

[1]When a prisoner is "laid in" his cell, he may not leave his cell until he is seen by a prison
official or medical service provider.  (Ford Dep. 17).

[2]Nanograms per milliliter.

or Metoprolol.  Buprorion is contra-indicated for patients with seizure disorders.  (Doc. No. 105, Pl.'s Resp. to McCarthy's MSJ, Ex. G, McCoy Aff. ¶ h).

Almost three years later, on August 10, 2007, plaintiff, as the personal representative of the estate of Randy J. Parsons, filed a civil rights action pursuant to 42 U.S.C. § 1983, alleging denial and delay of medical care in violation of the Eighth Amendment to Constitution of the United States, violation of the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States, state tort claims for gross negligence, and violation of the "Freedom of Information Act." (Doc. No. 1).

On August 20, 2007, this case was referred to this court for all pretrial proceedings.  (Doc. No. 3).

Pursuant to this court's order, on March 28, 2008, plaintiff filed an amended complaint. (Doc. No. 40).  In the amended complaint, plaintiff alleges violations of the Eighth and Fourteenth Amendments of the Constitution by the individual defendants and asserts a policy, custom, and practice civil rights claim, pursuant to the Eighth Amendment, against Director Caruso.

On July 13, 2009, Defendant John F. McCarthy, D.O., filed his motion for summary judgment.  (Doc. No. 102).  Defendants Caruso and Birkett filed their joint motion for summary judgment on October 15, 2009.  (Doc. No. 113).  Subsequently, on November 13, 2009, Defendants Pausits, Alexander, Kocot, and Bond filed their joint motion for summary judgment.  (Doc. No. 120).  The motions were fully briefed and this court heard oral argument on December 16, 2009.

## II. Standard of Review

The United States Court of Appeals for the Sixth Circuit has summarized the standard for summary judgment as follows:

5

> Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact such that the moving party is entitled to judgment as a matter of law. "The judge is not to weigh the evidence and determine the truth of the matter, but rather determine whether there is a genuine issue for trial."

*Totes Isotoner Corp. v. Int'l Chemical Workers Union Council/UFCW Local 664C*, 532 F.3d 405, 411-12 (6th Cir. 2008) (internal citations omitted).

## III. Analysis

### A. Dr. McCarthy's Motion for Summary Judgment Based on Qualified Immunity

Dr. McCarthy argues that he is entitled to summary judgment because he was not deliberately indifferent to Parsons' serious medical needs. (Doc. No. 102, McCarthy's MSJ 8). Dr. McCarthy asserts that he was aware of Parsons' serious medical needs and he appropriately treated Parsons' serious medical needs. (*Id.*) For this reason, Dr. McCarthy argues that he did not violate the Constitution and, therefore, he is entitled to qualified immunity. (*Id.*)

Plaintiff responds that Dr. McCarthy disregarded Parsons' "'urgent' and emergent need for Dilantin to control the substantial risk of seizures." (Doc. No. 105, Pl.'s Resp. to McCarthy's MSJ 10). Plaintiff argues that Dr. McCarthy was deliberately indifferent to Parsons' serious medical needs because he knew that Parsons did not have his medication and prescribed him anti-psychotics but did not order him Dilantin. (*Id.*) Plaintiff further asserts that Dr. McCarthy's statement that he cannot treat medical issues, like seizure disorders, is contradicted by evidence showing that psychiatrists, like Dr. McCarthy, routinely prescribe Dilantin to mentally ill patients. (*Id.* at 12). In sum, Plaintiff argues that there is enough evidence that Dr. McCarthy was deliberately indifferent to create a factual issue for trial and asks this court to deny his motion for summary judgment. (*Id.* at 16).

6

In order to rebut a qualified-immunity defense to an allegation of a constitutional tort, a plaintiff must establish: 1) that the defendant violated a constitutional right; and 2) that the right was "clearly established." *Leary v. Livingston County*, 528 F.3d 438, 441 (6th Cir.2008) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Qualified immunity is an affirmative defense that protects state officials from liability for civil damages when their conduct does "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

The Eighth Amendment prohibits prison and jail officials from acting with deliberate indifference to the medical needs of their prisoners. *Estelle v. Gamble*, 429 U.S. 97, 103-104 (1976). A deliberate indifference claim has two components, one objective and the other subjective. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The objective component requires Plaintiff to show a "sufficiently serious" medical need. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A "sufficiently serious" medical need is one that a physician has diagnosed as requiring mandatory treatment or one that a lay person would easily recognize as needing a doctor's attention. *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008) (citations omitted). Dr. McCarthy concedes that Parsons had a sufficiently serious medical need.

The subjective component requires Plaintiff to that show "the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir.2001) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). Plaintiff alleges that Dr. McCarthy knew that Parsons had a seizure order, understood that without Dilantin Parsons could suffer a seizure, and disregarded Parsons' risk of seizure by declining to prescribe Dilantin and order it from

the local pharmacy.  Plaintiff's argument fails for two reasons.  First, Parsons received medical treatment for his seizure: PA Heebsh saw Parsons hours before Dr. McCarthy examined him and PA Heebsh prescribed and ordered Parsons Dilantin.  Dr. McCarthy was aware that PA Heebsh saw Parsons and had prescribed him Dilantin when he examined Parsons and prescribed him anti-psychotics.  Dr. McCarthy, therefore, did not disregard Parsons' the risk posed by Plaintiff failing to receive Dilantin; Parsons' medical need for Dilantin was met when PA Heebsh prescribed him Dilantin.  Further, "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, 860, n. 5 (6th cir.1976).  *See also Sanderfer v. Nichols*, 62 F.3d 151, 154 (6th Cir. 1999) ("Deliberate indifference, however, does not include negligence in diagnosing a medical condition"). This court will not second guess Dr. McCarthy's decision to not duplicate PA Heebsh's Dilantin prescription or otherwise circumvent medical treatment given by another medical provider, particularly when Parsons received appropriate medical and mental health treatment from PA Heebsh and Dr. McCarthy.

Second, Plaintiff's  theory of liability is premised on the proposition that Dilantin ordered from the local pharmacy would have arrived and been administered to Parsons sooner than medication ordered from Pharmcorr.  However, Plaintiff has offered no evidence to support her theory.  There is no evidence documenting the arrival of the anti-psychotic drugs Dr. McCarthy ordered from the local pharmacy.  In addition, Plaintiff has not furnished any proof that drugs from the local pharmacy were administered to Parsons earlier than the Dilantin ordered from Pharmcorr. Thus, Plaintiff has not shown that even if Dr. McCarthy had ordered Dilantin from the local

pharmacy, the outcome would have been different.  In sum, Parsons' Dilantin deficit is not attributable to Dr. McCarthy; Dr. McCarthy properly prescribed drugs for Parsons' mental illnesses and did not err by failing to order Dilantin from the local pharmacy when it had already been prescribed by PA Heebsh.

Because Plaintiff has not shown that a factual question exists regarding whether Dr. McCarthy disregarded the risk posed by Parsons' seizure disorder, Dr. McCarthy is entitled to summary judgment, based on qualified immunity, on Plaintiff's claim that he violated the Eighth Amendment by failing to prescribe Dilantin and order it from the local pharmacy.

Dr. McCarthy also argues that he is entitled to summary judgment on Plaintiff's claim that he prescribed Wellbutrin to Parsons.  (Doc. No. 102, McCarthy's MSJ 8).  Plaintiff did not respond to this argument.

In the Amended Complaint, Plaintiff alleged that Dr. McCarthy violated the Eighth and Fourteenth Amendments by ordering the medical staff to administer Wellbutrin to Parsons.  (Am. Compl. ¶ 61).  There is absolutely no evidence that Dr. McCarthy prescribed Wellbutrin to Parsons or ordered the staff to administer Wellbutrin to Parsons.  The court acknowledges that the toxicologist found Wellbutrin present in Parsons' blood at the time of his death.  However, Plaintiff has not tied Dr. McCarthy to Parsons' ingestion of the drug.  Because Plaintiff has failed to offer evidence connecting Dr. McCarthy to Parsons' ingestion of Wellbutrin, Plaintiff cannot establish that Dr. McCarthy was responsible for the Wellbutrin found in Parsons' system.  Plaintiff, therefore, has not met her burden of showing that a factual question exists regarding whether Dr. McCarthy violated the Constitution by prescribing Wellbutrin to Parsons, a seizure disorder patient. Accordingly, Dr. McCarthy is also entitled to summary judgment on this claim.

9

**B.  Defendants Caruso and Birkett's Motion for Summary Judgment**

Defendants Caruso and Birkett first argue that Plaintiff's claims under the First, Eighth and Fourteenth Amendments should be dismissed because there is no evidence that either Caruso or Birkett were actively involved in the alleged constitutional violation.  (Doc. No. 113, Caruso et al. MSJ 5).  Caruso and Birkett assert that Plaintiff has not offered any evidence that either one of them participated in denying Plaintiff and Parsons' family members access to documents or were subjectively aware of and disregarded Parsons' serious medical needs.  (*Id.*)

Plaintiff does not dispute that Caruso and Birkett were not personally involved in the alleged constitutional violations.  Rather, Plaintiff's opposition to Caruso and Birkett's motion for summary judgment focuses on MDOC policies and customs that purportedly caused Parsons' death.  To prevail on § 1983 claim, a plaintiff must show personal involvement by the defendant in the constitutional violation. *Copeland v. Machulis*, 57 F.3d 476, 481 (6th Cir.1995) (per curiam).  A claimed constitutional violation must be based upon active unconstitutional behavior. *Grinter v. Knight*, 532 F.3d 567, 575 (6th Cir. 2008). Because Plaintiff has not presented any evidence of personal involvement in the alleged unconstitutional conduct, and it is not apparent from the record that Caruso or Birkett were personally involved in the alleged constitutional violations, Plaintiff's First, Eighth, and Fourteenth Amendment claims against Caruso and Birkett, in their individual capacities, should be dismissed.

Caruso and Birkett also argue that summary judgment should be entered on Plaintiff's policy, custom, and practice claim.  (Doc. No. 113, Caruso et al. MSJ 5).  Caruso and Birket first argue that Plaintiff's theory of liability, i.e. a *Monell* claim, is not applicable to individuals.  (*Id.* at 6).  If this court decides that Plaintiff may pursue a *Monell* claim, Caruso and Birkett argue that they were not

involved in developing or adopting the challenged policies, customs, and practices.  (*Id.* at 6).
Caruso and Birkett further argue that Plaintiff has not shown that the following are policies,
practices or customs of the MDOC: "not providing adequate mental health care," "transferring
inmates who present mental health issues prior to complete of treatment," "denying the deceased's
court appointed guardian from properly participating in the period review of the deceased's
treatment plans," and "not obtaining prescriptions from local pharmacies when needed for an inmate
but not stocked at the facility."  (*Id.* at 6).  Caruso and Birkett also state that Plaintiff has not shown
that the policies and customs at issue caused Parsons' death.  (*Id.*)

Plaintiff responds that she has provided sufficient evidence to create a genuine issue of
material fact as to whether Caruso and/or Birkett, through their deliberate conduct, were the
"moving force" behind the alleged unconstitutional customs and practices, which Plaintiff alleges
culminated in Parsons' death.[3]  (Doc. No. 130, Pl.'s Resp. 8).  Plaintiff asserts that she has shown
that Caruso, as the ultimate policy maker at MDOC, oversaw and implemented health care and
transfer policies that caused Parsons to be punished for behavior attributable to his mental illness
and be transferred without regard to his mental health treatment status.  (*Id.* at 10, 13, 15).  Plaintiff
also argues that she has presented evidence that Birkett's custom and practice of using part-time
psychiatrists, instead of hiring a full-time psychiatrist, constitutes deliberate indifference.  (*Id.*)
Lastly, Plaintiff argues that the policy which prevented Dr. McCarthy from prescribing Plaintiff
Dilantin is unconstitutional as a matter of law because creating a dichotomy of medical versus

---

[3]This language in *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 694
(1978), is the requirement necessary to hold a *municipality* liable.  Plaintiff attempts to use it to
hold MDOC liable by characterizing her claim as one against the individual defendants, sued in
their official capacities.  In this context, it has not applicability.  *See* discussion *infra*.

11

mental health treatment denies adequate treatment by policy.  (*Id.* at 20).

What Plaintiff fails to address, however, is whether she can pursue a *Monell* claim against Caruso and Birkett.   In *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 690 (1978), the Supreme Court held that local government units, i.e. municipalities, were "persons" for the purposes of 42 U.S.C. § 1983, and Local governing bodies, therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.  *Id.*  Thus, a plaintiff may recover against local governments and local government officials, sued in their official capacities, for unconstitutional policies, customs, and practices that injured the plaintiff.  *Id.* at 690-91, 694.  The Supreme Court emphasized that its decision only applied to municipalities that were not considered part of the state for purposes of the Eleventh Amendment.  *Id.* at 691 n. 54.

The MDOC is considered part of the state for purposes of the Eleventh Amendment. *Turnboe v. Stegall*, 234 F.3d 1270 (6th Cir. 2000) (Table).  Thus, Plaintiff may not pursue a *Monell* claim against Caruso and Burkett, state officials sued in their official capacities for monetary damages for allegedly unconstitutional policies, practices, and customs.  *See Monell*, 436 U.S. at 691 n. 54.

Of course, even if Plaintiff sued Caruso and Birkett in their individual capacity, she still would be unable to pursue a *Monell* claim because *Monell* only applies to suits against local government officials sued in their official capacities.  *Monell*, 436 U.S. at 690.

Accordingly, Count II of Plaintiff's complaint, the policy, custom, and practice claim, should be dismissed as a matter of law.

**C. Defendants Pausits, Alexander, Bond, and Kocot's Motion for Summary Judgment**

Defendants Pausits, Alexander, Bond, and Kocot seek summary judgment of Plaintiff's 42 U.S.C. § 1983 claim based on inadequate medical care. (Doc. No. 120, Pausits et al. MSJ 4-5). Nurses Pausits and Alexander argue that Plaintiff has not provided evidence creating a genuine issue of material fact as to whether Nurses Pausits and Alexander administered Wellbutrin to Parsons and failed to obtain medical treatment. (*Id.* at 8). Sergeant Bond and Officer Kocot argue that the facts do not support Plaintiff's allegations that they failed to properly monitor Parsons and denied him adequate medical care. (*Id.* at 7). Pausits, Alexander, Bond, and Kocot also all argue that they are entitled to qualified immunity because Plaintiff has not shown that they violated clearly established law. (*Id.* at 9-10).

Plaintiff responds that there is a question of material fact as to whether Nurse Pausits was deliberately indifferent to Parsons' serious medical needs by: 1) failing to do Parsons' medical intake within eight hours of his arrival at Standish; 2) failing to obtain medications for Parsons after she realized that he did not have his medications; 3) failing to administer Dilantin to Plaintiff on August 27, 2004. (Doc. No. 131, Pl.'s Resp. to Pausits et al.'s MSJ 9-13). Plaintiff further argues that the evidence creates a factual question as to whether Nurse Alexander was deliberately indifferent to Parsons' serious medical needs by placing Parsons' request for mental health services on August 27, 2004 into the outpatient mental health mailbox, when he knew that it would not be seen by the psychiatrist until the following Monday. (*Id.* at 13-15).

Also, Plaintiff contends that Sergeant Bond and Officer Kocot were deliberately indifferent to Parsons' serious medical needs when, having observed Parsons' stiff body movements and odd behavior, they did not place Parsons' in an observation cell. (*Id.* at 17). Plaintiff asserts that factual

13

questions as to whether Officer Kocot filled out a mental health referral, as he claims he did, and whether Officer Kocot knew that Parsons would not see a mental health professional until the following Monday. (*Id.* at 17). Plaintiff also asserts that Sergeant Bond should have contacted mental health services when he was notified of Parsons' strange behavior in the chow line. (*Id.* at 18).

In the amended complaint, Plaintiff accuses Nurse Pausits of failing to administer Dilantin to Parsons, instead administering Wellbutrin, a drug contra-indicated for seizure patients, failing to obtain medical treatment for Parsons on August 28, 2004 as his condition deteriorated, failing to obtain Dilantin from the local pharmacy. (Am. Compl. ¶¶ 32, 34, 45, 57, 61). Plaintiff did not plead a claim based on Nurse Pausits failure to perform Parsons' medical intake within eight hours, in accordance with MDOC policy. Because Plaintiff did not allege in the amended complaint that Nurse Pausits was deliberately indifferent to Parsons' serious medical needs by failing to perform his medical intake within eight hours of his arrival at Standish, this court will not address this unpled claim.[4]

With respect the claims Plaintiff did plead against Nurse Pausits, namely that she failed to obtain Dilantin from the local pharmacy, did not administer Dilantin to Parsons and substituted Wellbutrin, and failed to obtain medical treatment for Parsons on August 28, 2004, as his condition deteriorated, the court concludes that Pausits is entitled to qualified immunity and summary judgment.

---

[4]Even if this court were to address this claim, it would not survive summary judgment, because Plaintiff has presented no evidence showing that Nurse Pausits' allegedly tardy medical intake amounted to deliberate indifference of Parsons' serious medical needs. There is absolutely no evidence that Nurse Pausits knew of and disregarded an excessive risk to Parsons' health by completing the medical intake outside of the eight hour window.

14

As stated above, in order to rebut a qualified-immunity defense to an allegation of a constitutional tort, a plaintiff must establish: 1) that the defendant violated a constitutional right; and 2) that the right was "clearly established." *Leary*, 528 F.3d at 441. Qualified immunity is an affirmative defense that protects state officials from liability for civil damages when their conduct does "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818.

Prison and jail officials who act with deliberate indifference to the medical needs of their prisoners are in violation of the Eighth Amendment. *Estelle*, 429 U.S. at 103-104. A deliberate indifference claim has two components, one objective and the other subjective. *Farmer*, 511 U.S. at 834. The objective component requires Plaintiff to show a "sufficiently serious" medical need. *See id*. A "sufficiently serious" medical need is one that a physician has diagnosed as requiring mandatory treatment or one that a lay person would easily recognize as needing a doctor's attention. *Harrison*, 539 F.3d at 518. It is undisputed that Parsons had a sufficiently serious medical need.

The subjective component requires Plaintiff to that show "the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock*, 273 F.3d at 703. Plaintiff has not shown that Nurse Pausits subjectively perceived facts form which she could infer substantial risk to the prisoner, that she in fact drew the inference, and then disregarded the risk.

Nurse Pausits first saw Parsons on the night of August 25, 2004, when she conducted his medical intake. (Doc. No. 120, Pausits et al.'s MSJ, Ex. 1, Transfer Assessment Screening). Nurse Pausits noted that Parsons arrived without his medication and scheduled him to see a medical service provider the next day. (*Id.*) At that time, Nurse Pausits did not consider it an emergency situation

for Parsons to go without his Dilantin. (Pausits Dep. 56-57, 61). Thus, Plaintiff has not shown that Nurse Pausits subjectively perceived facts from which to infer substantial risk to Parsons, drew the inference, and disregarded that risk. *See Comstock*, 273 F.3d at 703. The fact that Dr. McCarthy testified that Parsons arrival without medication created a "somewhat urgent situation" is irrelevant because the focus of the inquiry is what Nurse Pausits knew and perceived the situation to be at the time she saw Parsons.[5]  Simply put, Nurse Pausits was not deliberately indifferent by failing to immediately obtain Dilantin for Parsons because she did not perceive Parsons' lack of Dilantin to be a substantial risk to his health, nor did she disregard that risk. Nurse Pausits noted his lack of medication and scheduled him to see medical and mental health providers the next day.

Moreover, Plaintiff has not provided evidence to create a genuine issue of material fact as to whether Nurse Pausits' alleged failure to order Dilantin from the local pharmacy, either before or after PA Heebsh prescribed it, was deliberate indifference. First, Nurse Pausits could not have effected a medication order without a prescription. There is no evidence that Parsons had a prescription for Dilantin, that could have been filled by the local pharmacy, when he arrived at Standish. Thus, the fact that she is able to order  medications, as she testified in her deposition, is immaterial because there is no evidence that a prescription existed upon which to order the medications. It is not as if Parsons' was prescribed Dilantin, upon his arrival, and Nurse Pausits chose not to order it. Second, there is no evidence that Nurse Pausits was aware that PA Heebsh had

---

[5]In addition, Dr. McCarthy's statement does not directly support Plaintiff's proposition that Nurse Pausits should have realized that Parsons urgently needed Dilantin. Dr. McCarthy did not state that Parsons' lack of Dilantin created an urgent situation. Rather, he testified that Parsons arrived without his medications, which included his psychotropic medications and his Dilantin, and his arrival without medication created a "somewhat urgent situation." (McCarthy Dep. 16).

16

prescribed Dilantin and had not ordered it from the local pharmacy.  It is the responsibility of the medications nurse to order medications, pursuant to the medical providers instructions.  Plaintiff has not presented evidence that Nurse Pausits was the medications nurse, or was somehow otherwise responsible for obtaining Dilantin for Parsons, and did not do so.  In sum, Plaintiff has not shown that Nurse Pausits knew that failing to obtain Dilantin from the local pharmacy created a substantial risk to his health and disregarded that risk.  *See Comstock*, 273 F.3d at 703.

Next, Plaintiff argues that a factual question exists as to whether Nurse Pausits was deliberately indifferent by failing to administer Dilantin to Parsons and, instead, substituting Wellbutrin.  It is undisputed that Parsons did not have Dilantin in his system at the time he died.  The toxicologist found the following drugs in Parsons' system: Wellbutrin, Remeron, and Metoprolol. (Doc. No. 113, Caruso et al.'s MSJ Ex. 4, Spectrum Health Autopsy Report).  Nonetheless, Plaintiff has not offered any evidence explaining how the Wellbutrin got into Parsons' system and why the Dilantin was not present.  Plaintiff's attempt to attribute the Wellbutrin in Parsons' system to a medication error by Nurse Pausits falls flat.  The fact that Nurse Pausits initialed a form indicating that she administered Dilantin to Parsons on August 27, 2004, when the prison unit log shows that Nurse Alexander performed the medication round on August 27, 2004, does not show that Nurse Pausits switched his medications or create an inference that Nurse Pausits substituted Wellbutrin for Dilantin.  The record does not support Plaintiff's theory that Nurse Pausits substituted Wellbutrin for Dilantin, nor is it evidence of a genuine issue of *material* fact.  Also, Plaintiff's heavy reliance on the toxicology report does not create a factual issue as to whether Nurse Pausits willfully committed a medications error.  Plaintiff has not provided evidence from which the presence of Wellbutrin, and lack of Dilantin, can be attributed to Nurse Pausits.  For this reasons,

Plaintiff has not shown that Nurse Pausits was deliberately indifferent.

The last claim that Plaintiff pled against Nurse Pausits in the amended complaint was a deliberate indifference claim based on the fact that Nurse Pausits allegedly failed to obtain medical treatment for Parsons on August 28, 2004, as his condition deteriorated. Plaintiff has not offered any evidence that Nurse Pausits was working on August 28, 2004, saw Parsons that day, or was otherwise notified that his condition was deteriorating. Because Plaintiff has not provided proof to support this deliberate indifference claim, it should also be dismissed.

In conclusion, the court recommends that summary judgment be entered on the claims against Nurse Pausits. Plaintiff has not shown, with evidence, genuine issues of material fact remain for trial on Plaintiff's allegations of constitutional violations. Because Plaintiff has failed to show that a constitutional violation occurred, or that issues of material fact exist, Nurse Pausits is entitled to qualified immunity. *See Leary*, 528 F.3d at 441. Accordingly, Plaintiff's deliberate indifference claims against Nurse Pausits should, therefore, be dismissed.

With respect to Nurse Alexander, Nurse Alexander first argues that he is entitled to summary judgment on Plaintiff's claim that he administered Wellbutrin instead of Dilantin because, prior to August 28th, Nurse Alexander had not had any contact with Parsons. (Doc. No. 120, Pausits et al.'s MSJ 8). Plaintiff responds that the prison unit log states that Nurse Alexander was in Parsons' unit to do medication pass the night of August 27, 2004. (Doc. No. 131, Pl.'s Resp. to Pausits et al.'s MSJ 14).

The fact that Nurse Alexander does not recall administering Parsons' medications on August 27th, and it is unclear who actually administered Parsons' medication, as Nurse Pausits signed the medication form, does not, as explained above, create a genuine issue of material fact for trial. In

18

order to prevail on a deliberate indifference claim, Plaintiff must show that Nurse Alexander subjectively perceived facts from which to infer substantial risk to Parsons, drew the inference, and disregarded that risk. *See Comstock*, 273 F.3d at 703. Plaintiff has not proffered evidence showing that Nurse Alexander knowingly administered Wellbutrin to Parsons, disregarding the substantial risk to his health. Indeed, Plaintiff has not offered any evidence explaining or attributing the Wellbutrin in Parsons' system to any of the Defendants. Thus, Plaintiff has not shown that Nurse Alexander committed a constitutional violation, and he is entitled to qualified immunity and summary judgment on this claim.

Nurse Alexander next argues that summary judgment should be entered on Plaintiff's claim that he did not provide appropriate medical treatment because he acted reasonably when he processed Parsons' non-urgent request for mental health services. (Doc. No. 120, Pausits et al.'s MSJ 9). Plaintiff responds that it is unclear whether Parsons' kite was non-urgent because the kite was destroyed. (Doc. No. 131, Pl.'s Resp. to Pausits et al.'s MSJ 14). However, Plaintiff argues that the court can infer from Parsons' letters to his family, in which Parsons states that he does not think he is going to "make it," that the kite sought attention for an urgent mental health care issue. (*Id.*)

The problem with Plaintiff's argument that the court should infer Parsons' mental condition from his letters is that the inquiry for a deliberate indifference claim focuses on what Nurse Alexander perceived. Plaintiff must show that Nurse Alexander subjectively perceived facts from which to infer substantial risk to Parsons, drew the inference, and disregarded that risk. *See Comstock*, 273 F.3d at 703. Again, Plaintiff has not offered evidence showing that Parsons' mental health condition posed a substantial risk to his health, that Nurse Alexander knew that his mental

19

health condition posed a substantial risk to his health and disregarded that risk.  Accordingly, Plaintiff has not overcome Nurse Alexander's qualified immunity defense and summary judgment should be entered in Nurse Alexander's favor.[6]

Lastly, the court will address Sergeant Bond and Officer Kocot's motion for summary judgment.  Sergeant Bond and Officer Kocot argue that summary judgment should be entered on Plaintiff's claim that they did not properly monitor Parsons and denied him adequate medical care because both acted reasonably.  (Doc. No. 120, Pausits et al.'s MSJ 7).  Plaintiff responds that a jury could find that Sergeant Bond and Officer Kocot were deliberately indifferent by not placing Parsons in an observation cell and calling medical assistance immediately, when, after chow hall, Parsons was obviously showing signs of deteriorate and distress.  (Doc. No. 131, Pl.'s Resp. to Pausits et al.'s MSJ 17).  Plaintiff also argues that a factual question exists as to whether Officer Kocot prepared a mental health referral form, which Defendants claim was lost.  (*Id.*)

After Parsons was sent back to cell for acting strange during chow hall, Officer Kocot observed Parsons wearing his shower shoes over his state-issued shoes, filled out a mental health referral, and asked Sergeant Bond to come down to see Parsons.  (Doc. No. 120, Pausits et al.'s MSJ, Ex. 11, Kocot Aff. ¶ 4).  There is no evidence that Officer Kocot knew of or perceived facts from which he could have inferred that Parsons' condition at that time put his health at substantial risk and disregarded that risk.  *See Comstock*, 273 F.3d at 703.  When Parsons returned to his cell, Officer Kocot did not know that Parsons had a seizure condition, nor did he perceive that Parsons

---

[6]The court notes that Plaintiff attempts to shoehorn a *Monell* claim into her complaint in her response.  (Doc. No. 131, Pl.'s Resp. to Pausits et al.'s MSJ 15).  First, Plaintiff did not pled a policy, custom, and practice claim against Nurse Alexander in her amended complaint.  Second, as explained above, Plaintiff may not pursue *Monell* claims against state employees such as Nurse Alexander.

was about to have a medical emergency.  (Kocot Aff. ¶ 6).  In addition, the fact that Officer Kocot's mental health referral no longer exists does not create a genuine issue of material fact; it is immaterial to Plaintiff's deliberate indifference whether or not Officer Kocot filled out the mental health referral because it does not show whether or not Officer Kocot was deliberately indifferent to Parsons' medical condition.  Because Plaintiff has not produced sufficient evidence to show that Officer Kocot was aware of a substantial risk to Parsons' health and he ignored that risk, Officer Kocot is entitled to qualified immunity and summary judgment.

Approximately twenty minutes after Parsons returned to his cell, Sergeant Bond arrived to check on him and found him unresponsive on the floor.  (Ford Dep. 17; Doc. No. 133, Defendants' Reply Br. Ex. 2, DVD of Parsons; Doc. 120, Pausits et al.'s MSJ, Ex. 10, Bond Aff. ¶ 4).  This was the first time that Sergeant Bond had ever seen Parsons.  Sergeant Bond had no knowledge of Parsons' medical or mental health conditions, nor had he observed Parsons at anytime prior.  (Bond Aff. ¶ 6).  Plaintiff has not shown, therefore, that Sergeant Bond was deliberately indifferent to Parsons' medical condition.  At no time did Sergeant Bond subjectively perceived facts from which to infer substantial risk to Parsons, drew the inference, and disregarded that risk.  *See Comstock*, 273 F.3d at 703.  Therefore, Plaintiff has not overcome Sergeant Bond's assertion of qualified immunity, by showing that a genuine issue of material fact for trial on whether a constitutional violation occurred, and Sergeant Bond should be granted summary judgment.

## IV. Conclusion

For the reasons discussed above, the court recommends that Defendant Dr. McCarthy's Motion for Summary Judgment Based on Governmental Immunity (Doc. No. 102), Defendants Caruso and Birkett's Motion for Summary Judgment (Doc. No. 113), and Defendants Pausits,

Alexander, Bond and Kocot's motion for summary judgment (Doc. No. 120) be **GRANTED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen(14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court. The response shall address each issue contained within the objections specifically and in the same order raised.

S/Virginia M. Morgan
Virginia M. Morgan
United States Magistrate Judge

Dated: February 4, 2010

---

**PROOF OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record via the Court's ECF System and/or U. S. Mail on February 4, 2010.

s/Jane Johnson
Case Manager to
Magistrate Judge Virginia M. Morgan